IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

WILLIAM JACK PARKERSON,

        Plaintiff,

    v.

ODOC, WHELAN, C. BAUER, COLLETTE PETERS, MIKE GOWER, RAMIREZ, CARDINAS, SANCHEZ, C/O THOMSON, ERIN REYES, T. GUITERREZ, M DEACON, YEAGER,

        Defendants.

No. 2:23-cv-01865-HZ

OPINION & ORDER

HERNÁNDEZ, Senior District Judge:

    Plaintiff William Jack Parkerson brings this civil rights case against Defendants Oregon Department of Corrections ("ODOC"), Whelan, C. Bauer, Collette Peters, Mike Gower, Ramirez, Cardinas, Sanchez, C/O Thomson, Erin Reyes, T. Guiterrez, M. Deacon, and Yaeger. Plaintiff alleges that Defendants violated the Eighth Amendment when they failed to protect him from two different assaults by other inmates. Plaintiff brings a state law claim for negligence and

1 – OPINION & ORDER

claims under 42 U.S.C. § 1983. Both Plaintiff and Defendants now move for summary judgment. For the reasons that follow, the Court denies Plaintiff's motion and grants Defendants' motion.

## BACKGROUND

Plaintiff's claims involve two assaults by other inmates at Two Rivers Correctional Institution ("TRCI"). The first took place in a recreation yard at TRCI on February 13, 2022. The second took place on Unit 6 at TRCI on February 22, 2022. Plaintiff alleges that Defendants violated the Eighth Amendment when they failed to protect him from these assaults.

### I.    February 13 Incident

On February 13, another Inmate—AIC M—initiated a physical altercation with Plaintiff that lasted for a little over a minute. Herron Decl. Ex. 2, at 1, ECF 45. Plaintiff was running laps on a track and was tackled and assaulted by AIC M, causing injuries to Plaintiff's face, neck, and back. Pl.'s MSJ 4, ECF 30. Defendant Deacon was the day shift officer on duty at the time and was "being relieved by [Defendant] Gutierrez who was at that time walking the tier doing a tier check." *Id.* He alleges both officers failed to respond to the incident or protect him from bodily harm. *Id.*

Plaintiff did not report the incident to anyone. Herron Decl. Ex. 2, at 1. Instead, officers became aware of the altercation the following day. *Id.*; Pl.'s MSJ Ex. 2. Plaintiff and AIC M were transferred to the disciplinary segregation unit ("DSU") and served nine days in segregation for the assault. Pl.'s MSJ Ex. 11.

There were no documented conflicts between AIC M and Plaintiff at the time of the assault. Herron Decl. ¶ 21. Nor were there any previous altercations between them or any history of assaultive or violent conduct by AIC M. *Id.* ¶¶ 22, 25. But Plaintiff states that he was harassed by AIC M for six to nine months before the altercation and that C/O Dean and C/O Delapaz

witnessed AIC M's aggressive behavior towards Plaintiff. First Parkerson Decl. 1. Specifically, Plaintiff states that both officers observed AIC M "mean mugging" Plaintiff, and that Plaintiff discussed this and other "trolling" behavior with C/O Delapaz. *Id.* at 1-2.

## II.     February 22 Incident

On February 22, Plaintiff was released from the DSU. At the time he was transferred into the DSU after the February 13 incident, Plaintiff notified Defendant Ramirez that he could not be housed with active Norteños. Pl.'s MSJ 5. Upon release from the DSU, he asked Defendant Ramirez what unit he was going to be transferred to. *Id.* When Defendant Ramirez informed Plaintiff that he would be in general population Unit 6, Herron Decl. ¶¶ 27, 29, Plaintiff reminded Defendant Ramirez that he could not be housed with active Norteños or he would be in danger, Pl.'s MSJ 5. Plaintiff also asked to talk with someone who could correct this housing error "to prevent the assault that was certain to occur." *Id.*

Plaintiff also spoke with Ms. Post, the inmate hearings officer at the time. Plaintiff asked that Ms. Post call Housing Assignment Officer Whelan and ask that Plaintiff be sent to Unit 8, which Plaintiff alleges is a "dropout unit" where he had been safely housed previously with no conflicts. *Id.* at 5-6. Ms. Post forwarded Plaintiff's request to Defendant Whelan. *Id.* at 5. Defendant Whelan responded that Plaintiff's options were transferring to Unit 6 or remaining in the DSU. *Id.* Plaintiff then asked Ms. Post to call Defendant Bauer to ask him to override Defendant Whelan's placement decision and instead place him in Unit 8. *Id.* He again reiterated that he would be assaulted in Unit 6. *Id.* at 5-6. Plaintiff says that Defendant Bauer did not take any corrective action. *Id.* at 6.

Plaintiff also relayed his concerns to Defendants Sanchez, Cardinas, and Thompson while waiting to be released from the DSU. *Id.* He informed Defendants that he is an ex-Norteño and at

3 – OPINION & ORDER

risk of assault without a change in his housing. *Id.* Defendant Sanchez allegedly responded to Plaintiff's concerns by relaying that there were no Norteños on Unit 6 at the time. *Id.* Plaintiff alleges that Defendants have been aware of his dropout status since 2004 and that Defendants could have "easily corrected Plaintiffs housing assignment" to Unit 8 or sent him to administrative segregation until a bunk in Unit 8 was available. *Id.* at 6-7.

Plaintiff was ultimately released to Unit 6. *Id.* at 7. He said that he was confronted by an active Norteño—AIC H—returning from the shower soon after Plaintiff entered the unit. *Id.*; Pl.'s MSJ Ex. 1. AIC H asked Plaintiff what gang he was affiliated with. Pl.'s MSJ 7. Plaintiff said he was a dropout Norteño, and AIC H responded "we gotta get down." *Id.* According to Plaintiff, this meant that they would need to fight. *Id.*; Am. Compl. ¶ 4, ECF 12. Plaintiff threw the first punch because he believed a fight was inevitable. First Parkerson Decl. 4.; Pl.'s MSJ Ex. 1. Plaintiff sustained injuries to his face, back, and nose. Pl.'s MSJ 7. Plaintiff was also exposed to chemical agents by corrections staff during the altercation, causing injuries to his eyes and body. *Id.* at 8; Herron Decl. ¶ 34.

At the time of the incident with AIC H, there were no documented conflicts between AIC H and Plaintiff, and Plaintiff had never informed ODOC of any conflict with AIC H specifically. Herron Decl. ¶¶ 34-35. Nor were there any documented conflicts or reports of concerns by Plaintiff involving anyone else housed on Unit 6. *Id.* ¶ 29. Defendants also assert that there are no active or inactive gang units in TRCI. *Id.* ¶ 6. Rather, each general population unit and the incentive housing units house current or former gang members. *Id.* ¶ 7. Defendants admit, however, that physical altercations can arise between AICs due to their current of former gang affiliations. Pl.'s MSJ Ex. 6 (Bauer Resp. Interrog. 10).

4 – OPINION & ORDER

Unit officers do not have the authority to make housing assignments, which are typically handled by the Housing Assignment Officer. Herron Decl. ¶¶ 4-5. ODOC uses the "Cellmatch" computer system to make assignments, which identifies inmates that an inmate can be housed with based on specific criteria. These criteria include history of conflict, vulnerability/aggressive designators, and age, among others. *Id*. Current or former gang affiliation is not usually one of the criteria used to determine housing assignments. *Id.* ¶ 6. ODOC does not classify housing units as active or inactive gang units. *Id.* Rather, the system documents specific conflicts between AICs. *Id.* ¶ 9. Inmates are able to request "voluntary administrative housing" if they have a generalized concern for their safety. *Id.* ¶ 10.

Gang affiliation may lead to an inmate's assignment to a Security Threat Management Lieutenant, who manages caseloads of inmates who are an elevated security risk. Bauer Decl. ¶¶ 3, 5. Gang affiliation is one factor considered by ODOC in determining whether an AIC presents an elevated security risk, but it is not determinative. *Id.* ¶¶ 5, 8. Security Threat Management Lieutenants are not usually involved in housing assignments. *Id.* ¶¶ 10, 11.

Plaintiff contends that previous ODOC policy created dropout and active gang units at prisons to keep inmates safe from predation by gang members. Pl.'s MSJ 8-9. This policy ended in 2019 when ODOC implemented the Cellmatch system. *Id.* Plaintiff alleges that dropouts are "routinely assaulted, bullied, extorted, and harassed" since the policy change. *Id*. at 9, 28 (describing recent attacks against drop out Norteños, including some involving AIC H).

**STANDARDS**

Summary judgment is appropriate if there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party bears the initial responsibility of informing the court of the basis of its motion, and

identifying those portions of "'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting former Fed. R. Civ. P. 56(c)).

Once the moving party meets its initial burden of demonstrating the absence of a genuine issue of material fact, the burden then shifts to the nonmoving party to present "specific facts" showing a "genuine issue for trial." *Fed. Trade Comm'n v. Stefanchik*, 559 F.3d 924, 927–28 (9th Cir. 2009) (internal quotation marks omitted). The nonmoving party must go beyond the pleadings and designate facts showing an issue for trial. *Bias v. Moynihan*, 508 F.3d 1212, 1218 (9th Cir. 2007) (citing *Celotex*, 477 U.S. at 324).

The substantive law governing a claim determines whether a fact is material. *Suever v. Connell*, 579 F.3d 1047, 1056 (9th Cir. 2009). The court draws inferences from the facts in the light most favorable to the nonmoving party. *Earl v. Nielsen Media Rsch., Inc.*, 658 F.3d 1108, 1112 (9th Cir. 2011). If the factual context makes the nonmoving party's claim as to the existence of a material issue of fact implausible, that party must come forward with more persuasive evidence to support its claim than would otherwise be necessary. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## DISCUSSION

Plaintiff and Defendants both move for summary judgment. Defendants move for summary judgment on all of Plaintiff's claims, arguing that his state law claims are barred by the Eleventh Amendment and Defendants' actions do not constitute a violation of Plaintiff's Eighth Amendment right to be free from cruel and unusual punishment as a matter of law. Defs.' Mot. Summ. J., ECF 44. Plaintiff moves for summary judgment on the merits of his claims. Pl.'s Mot.

Summ. J. The Court finds that Defendants are entitled to summary judgment on all of Plaintiff's claims.

## I.     Eleventh Amendment Immunity

Defendants seek summary judgment on Plaintiff's negligence claims, arguing that they are barred by the Eleventh Amendment. The Court agrees.

The Eleventh Amendment stands "for the constitutional principle that state sovereign immunity limit[s] the federal courts' jurisdiction under Article III." *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 64 (1996). State sovereign immunity extends to state agencies and departments, which are arms of the state. *See Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100 (1984) ("It is clear, of course, that in the absence of consent a suit in which the State or one of its agencies or departments is named as the defendant is proscribed by the Eleventh Amendment."); *Stoner v. Santa Clara Cty. Off. of Educ.*, 502 F.3d 1116, 1122 (9th Cir. 2007) (discussing the "well-established Eleventh Amendment principle that a governmental entity may be an arm of the state protected by sovereign immunity"). State prisons are considered state agencies for purposes of the Eleventh Amendment. *Allison v. California Adult Auth.*, 419 F.2d 822, 823 (9th Cir. 1969). Under the Eleventh Amendment, "[s]tates may not be sued in federal court unless they consent to it in unequivocal terms or unless Congress, pursuant to a valid exercise of power, unequivocally expresses its intent to abrogate the immunity." *Green v. Mansour*, 474 U.S. 64, 68 (1985).

The Oregon Tort Claims Act ("OTCA") provides for a limited waiver of sovereign immunity. It is not, however, a waiver of Eleventh Amendment immunity from suit in federal court. *See Millard v. Or. Dep't of Corr.*, 2014 WL 2506470, at *14 (D. Or. June 3, 2014); *see also Estate of Pond v. Oregon*, 322 F. Supp. 2d 1161, 1165 (D. Or. 2004) ("The

7 – OPINION & ORDER

[OTCA] is a waiver of sovereign immunity but does not waive Eleventh Amendment immunity. Thus, suits by private parties against the state must be brought in state court.").

Here, Plaintiff brings negligence claims against ODOC. Am. Compl. 11-13, ECF 12. Because ODOC is immune from suit in tort in this Court under the Eleventh Amendment, Plaintiff's claims against it must be dismissed. *See, e.g.*, *Eaton v. Two Rivers Correction Inst. Grievance Coordinator Enyon*, Case No. 2:20-cv-1251-SI, 2020 WL 7364975, at *6 (D. Or. Dec. 15, 2020) (dismissing claims against ODOC based on Eleventh Amendment immunity); *Thunderbird v. Or. State Dep't of Corr.*, No. CV 08-1404-PK, 2011 WL 2971798, at *8 (D. Or. June 28, 2011) (same).

## II.    Eighth Amendment Claims

Plaintiff alleges that Defendants violated the Eighth Amendment when they failed to protect him from the February 13 and 22 assaults. "The Constitution 'does not mandate comfortable prisons,' but neither does it permit inhumane ones . . ." *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (quoting *Rhodes v. Chapman*, 452 U.S. 337, 349 (1981)). The Eighth Amendment requires prison officials to provide humane conditions of confinement, including "tak[ing] reasonable measures to guarantee the safety of the inmates." *Id.* (citation omitted). Relevant to Plaintiff's claims in this case, "prison officials have a duty to protect prisoners from violence at the hands of other prisoners." *Id.* at 833 (citation and ellipses omitted). "Being violently assaulted in prison is simply not part of the penalty that criminal offenders pay for their offenses against society." *Id.* at 834 (internal quotation marks and citation omitted).

Nevertheless, unless a prison official knows of and disregards an excessive risk of harm to an inmate, the official is not liable under the Eighth Amendment. *Id.* at 837. To prove an Eighth Amendment violation based on a failure to protect, a plaintiff must meet two

requirements. First, the plaintiff must show that he was "incarcerated under conditions posing a *substantial risk of serious harm*." *Id.* at 834 (emphasis added). That is, the Eighth Amendment violation "must be, objectively, sufficiently serious." *Id.* Second, the plaintiff must present facts showing prison officials were deliberately indifferent to the risk to the prisoner's health or safety. *Id.* The prison official must know of and disregard an excessive risk of harm. *Id.* at 837.

     Deliberate indifference "'does not require that the guard or official believe to a moral certainty that one [AIC] intends to attack another at a given place at a time certain before that officer is obligated to take steps to prevent such an assault,' however the official must have more than a mere suspicion that an attack will occur." *Leonard v. Peters*, No. 21-35471, 2023 WL 387035, at *2 (9th Cir. Jan. 10, 2023) (citing *Berg v. Kincheloe*, 794 F.2d 457 459 (9th Cir. 1986)). In *Chandler v. Amsberry*, for example, the Court found that "generalized fears of harm" arising from the plaintiff's status as a sex offender were insufficient to support a claim of deliberate indifference under the Eighth Amendment. No. 3:08-CV-00962-SI, 2014 WL 1323048, at *1 (D. Or. Mar. 28, 2014). There, the plaintiff had been "subjected to implied threats through hostile stares and body language and offensive comments" but had not presented "evidence of a specific or direct threat of imminent bodily harm and the ability of another to effectuate that harm." *Id.* at *7. The Court concluded that under the Eighth Amendment, the general risk of harm the plaintiff faced as a sex offender—through "general intimidation, harassment, and nonspecific threats"—was not constitutionally intolerable. *Id.*; *cf. Leonard*, 2023 WL 387035 at *1-2 (finding that evidence of kytes "detailing threats, incidents of harassment, and 'faux' swings" at the plaintiff were enough to show that "the defendants were 'subjectively aware' that the plaintiff had been threatened and was therefore at risk of serious harm").

9 – OPINION & ORDER

Here, even viewing the facts in the light most favorable to Plaintiff, Plaintiff has not demonstrated anything more than nonspecific threats, intimidation, and a generalized fear of harm. With regard to the February 13 incident, there were no documented conflicts between Plaintiff and AIC M prior to the assault. Herron Decl. ¶ 21. Plaintiff alleges that AIC M was harassing him for six to nine months—specifically, that AIC M was "mean mugging" him. First Parkerson Decl. 1-2. And he alleges that nonparties C/O Delapaz and C/O Dean witnessed this behavior. *Id.* But there is no evidence that AIC M did anything more than intimidate or harass Plaintiff, or that Defendants Deacon and Gutierrez were aware of this harassing behavior. Nonspecific harassing behavior and intimidation by AIC M—known by nonparty officers—does not demonstrate Defendants were aware of a substantial risk of serious harm to Plaintiff.

Similarly, Plaintiff informed Defendants of nothing more than generalized fears due to his dropout status in advance of the February 22 assault. On the day of the assault, Plaintiff states that he informed Defendants Ramirez, Sanchez, Cardinas, Thompson, Whelan, and Bauer that he wanted to be housed on Unit 8 and could not be housed in a general population unit—such as Unit 6—with active Norteños because of his former gang affiliation. Pl.'s MSJ 5-7. Plaintiff also generally alleges that dropouts are "routinely assaulted" by gang members, *id.* at 28, and Defendants admit that physical altercations can arise between current and former gang members, Pl. MSJ Ex. 6 (Bauer Resp. Interrog. 10). But Plaintiff provides no other evidence that he faced a substantial risk of serious harm due to his status as a dropout Norteño. There were no other documented altercations between AIC H and Plaintiff or any other AIC on Unit 6. Herron Decl. 29, 34-35. There is also no evidence Plaintiff had been in an altercation with Norteños previously due to his dropout status. Even if Plaintiff's allegations are true that Defendants knew Unit 8 was a "dropout unit" while Unit 6 housed active Norteños, these non-specific fears of harm do not

10 – OPINION & ORDER

demonstrate that Defendants were aware of a substantial risk of serious harm to Plaintiff if he were to be housed in Unit 6 instead of Unit 8.

In addition, there is insufficient evidence that Plaintiff's fears were even conveyed to certain Defendants in this case prior to the February 22 incident. Specifically, there is no evidence that these concerns or any request for a new housing assignment were conveyed to Defendants Peters, Gower, Reyes, or Yeager.

In sum, there is insufficient evidence that Defendants were aware of a sufficiently serious risk of harm to Plaintiff before the February 13 and February 22 incidents. Plaintiff has not provided evidence that Defendants had knowledge of anything more than his generalized fear of harm arising from Plaintiff's status as a former gang member. *Compare Williams v. Wood,* 223 F. App'x 670, 671 (9th Cir.2007) ("[S]peculative and generalized fears of harm at the hands of other prisoners do not rise to a sufficiently substantial risk of serious harm to [plaintiff's] future health."), *with Galligar v. Franke*, No. 2:12-CV-01891-PK, 2015 WL 10373492, at *3 (D. Or. Dec. 28, 2015), *report and recommendation adopted*, No. 3:12-CV-01891-PK, 2016 WL 756473 (D. Or. Feb. 24, 2016) (finding the trier of fact could find the plaintiff was subjected to a substantial risk of serious harm where he was housed in an active gang unit and had a long-standing dispute with other prison gangs that had resulted in six previous physical altercations). Defendants are therefore entitled to summary judgment on Plaintiff's Eighth Amendment claims.

///

///

///

///

///

11 – OPINION & ORDER

**CONCLUSION**

The Court GRANTS Defendants' Motion for Summary Judgment [44] and DENIES Plaintiff's Motion for Summary Judgment [30]. Judgment will be entered in favor of Defendants, and this case will be dismissed with prejudice.

IT IS SO ORDERED.

DATED:___August 12, 2025_____.

*[signature]*
MARCO A. HERNÁNDEZ
United States Senior District Judge

12 – OPINION & ORDER